SYLVESTER BONNER, JR.,

      Plaintiff,

    v.

DANIEL O'TOOLE, et al.,

      Defendants.

No. 12 CV 981

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

In February 2010, Officer Daniel O'Toole of the Chicago Police Department received a tip from an unidentified "John Doe" informant about drug activity in the building at 4929 W. Adams Street. Based on the informant's report, Officer O'Toole prepared a complaint for a warrant and brought the informant before a state-court judge. The judge signed the warrant, which permitted search of "[t]he entire 1st floor apartment" at 4929 W. Adams, as well as of the supposed inhabitant of that apartment, a woman called "Shu-Shu." Later that day, O'Toole and several other CPD officers executed the warrant. Using information from the informant that did not appear in either the warrant or its underlying affidavit—that Shu-Shu's apartment would be the first door on the right, on the lowest level—the officers entered and searched a ground-level apartment in the 4929 building.

As it turned out, there were two ground-level apartments in that building, and the units at ground level were actually "basement"-level apartments—that is, the first-floor apartments were in reality one level up. Nor, as it happened, was the

apartment the officers searched Shu-Shu's apartment. A man named Sylvester Bonner lived there. During the course of the search, Bonner's front door was broken and his personal belongings strewn about. Some of his clothing was damaged, and at some unknown point in time, several electronics (a computer, cell phone, and sound system) went missing.

Bonner sued Officer O'Toole and various "unknown officers" of the Chicago Police Department under 42 U.S.C. § 1983, alleging violation of Bonner's Fourth Amendment rights (Counts I–V), as well as civil conspiracy (Count VI). Bonner also sued the City of Chicago under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 665 (1978). Bonner, O'Toole, and the City each filed a motion for summary judgment. For the reasons discussed below, the City's motion is granted, and the remaining parties' motions are granted in part and denied in part. The "unknown officer" defendants are dismissed from the case.

## I. Legal Standard

Summary judgment must be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty, Wis.*, 752 F.3d 708, 712 (7th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted). In reviewing a summary-judgment motion or a cross-motion for summary judgment, a court construes all facts, and draws all reasonable inferences from those facts, in favor of

the non-moving party. *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014) (quoting *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013)).

## II.    Facts

The plaintiff has in certain instances responded to defendants' Local Rule 56.1 statements of fact by denying the truth of, or denying and moving to strike, entire paragraphs of those statements. While denials of this sort may sometimes be appropriate, many of plaintiff's objections here are overbroad in that they concern only one aspect of a given factual statement rather than the whole of the facts presented in that paragraph. *See, e.g.*, [283] at 11 ¶ 29[1] (denying and moving to strike a statement that the defendant prepared two search warrants as a result of an informant and investigation, on the basis that—in plaintiff's estimation—the record does not reflect that a true "investigation" was actually conducted). Argumentative responses are also inappropriate. *See, e.g.*, *id.* at 14–15 ¶ 44 (denying and moving to strike a given factual statement because, according to plaintiff, it suggests an "[i]mproper legal inference"). The purpose of Local Rule 56.1 is to permit the district court to identify at summary judgment which material facts are in dispute. The parties' Rule 56.1 statements (and responses) are viewed with this principle in mind. Unless otherwise noted, the facts related below are undisputed or are considered undisputed because the responding party did not properly controvert the factual statement as required by local rule.

---

[1] Citations to the record are designated by the document number as reflected on the district court's docket, enclosed in brackets; referenced page numbers are from the CM/ECF header placed at the top of filings.

### A.      The Searches at 4923–4929 W. Adams

In early 2010, Daniel O'Toole was an officer with the Chicago Police Department. *See* [291] at 1 ¶ 2. He was at that time a member of an anti-violence task force, which included approximately eight officers (and one sergeant) from various police-force districts. *See* [283] at 1 ¶ 2. In January 2010, Officer O'Toole was driving on the west side of Chicago when he claims he was flagged down by a woman. *See* [283] at 5 ¶ 10. The woman said she had information for O'Toole, and told him that drugs were being sold at the buildings located at 4925 and 4927 W. Adams Street. *See id.*; *see also* May 13, 2013 Deposition of Daniel O'Toole, [279-13] at 35, Tr. at 138–39.[2] The woman said she knew cocaine was being sold at those locations because she herself had bought some. *See* [283] at 5 ¶ 11. The woman got in O'Toole's car, and they drove to the addresses she had mentioned. *See id.* at 7 ¶ 16; O'Toole Deposition, [279-13] at 41, Tr. at 163; *id.* at 48, Tr. at 189. The two addresses were part of a U-shaped apartment complex containing four addresses in total: 4925 and 4927 W. Adams—the two addresses identified by the informant— and 4923 and 4929 W. Adams. *See* [283] at 6 ¶ 12. At the center of the "U" were

---

[2] Bonner disputes the credibility of O'Toole's account, claiming that O'Toole's story is not believable because, among other things, O'Toole was in fact stationed quite far from where he says he was approached by the woman, and because it was improbable that the woman would have "snitched" on any drug dealers in that neighborhood (since it would have been dangerous to do so, and because the woman herself had sold drugs and so was unlikely to report her suppliers). *See* [283] at 5 ¶ 10. As we shall see, however, the woman's tip led to two positive drug raids. Since her story—and O'Toole's account of his first meeting with her—are presented here only as background, and are not material to the disposition of the parties' summary-judgment motions, I assume for the purposes of those motions that his account is truthful.

4925 and 4927, flanked by 4923 (on the left) and 4929 (on the right). *See id.*; *see also* [253] (photograph of complex).

O'Toole arranged to meet with the woman again, and on January 26, 2010, he obtained from her additional information that he included the next day in affidavits for two separate search warrants, *see* [283] at 7 ¶¶ 17–18—one to search "[t]he entire 3rd floor apartment of the three-flat building located at 4925 W. Adams" (the premises of a woman named "Keyonna"), *see* [279-5]; and one to search "[t]he entire first floor apartment of the three-flat building located at 4927 W. Adams" (the premises of a woman known as "Neesh"), *see* [279-6]. On January 27, 2010, both O'Toole and the informant appeared before a judge of the Circuit Court of Cook County, Illinois, who signed the warrants. *See* [283] at 8 ¶¶ 20, 22; [279-5] at 1; [279-6] at 1. The informant signed the underlying affidavits as "J. Doe." *See* [279-5] at 2; [279-6] at 2. Later that day, the police raided the apartments described in the warrants; both searches uncovered drugs. *See* [283] at 9 ¶ 24; O'Toole Deposition, [279-13] at 55, Tr. at 216. O'Toole was part of the search team that executed the warrants on January 27. *See* [291] at 6–7 ¶¶ 21–22. To perform both of those searches (*i.e.*, for both the third-floor apartment at 4925 W. Adams and the first-floor apartment at 4927), O'Toole and his team had to ascend several stairs. *See id.* at 7 ¶ 22.

In February 2010, O'Toole saw the same "John Doe" informant under circumstances similar to their previous encounter. *See* O'Toole Deposition, [279-13] at 54–55, Tr. at 215–16 (testifying that he saw her near the same street corner).

According to O'Toole, the informant then told him that one of the apartments the police had searched in January was "back up"—meaning that drugs were again being sold out of that unit. *See* [283] at 10 ¶ 27; O'Toole Deposition, [279-13] at 55, Tr. at 216.[3] The informant also said that drugs were being sold from another unit in the same complex, this time at 4929 W. Adams, by a woman known as "Shu-Shu." *See* O'Toole Deposition, [279-13] at 55, Tr. at 216–17. Shu-Shu's apartment, said the informant, was the first door on the right as you enter that building, "and you can't go any lower." *See id.*; *see also* [283] at 12 ¶ 33.[4] O'Toole claims that he and another officer drove with the informant past the 4929 building, *see* [283] at 10 ¶ 28; [291] at 11 ¶ 39—though the other officer's memory of this event was fuzzy, *see* July 9, 2013 Deposition of Jorge A. Martinez, [259] at 98–99, Tr. at 97–98.

---

[3] Bonner objects to the use in O'Toole's Rule 56.1 statement of the phrase, "sales were back up at the property," and moves to strike that paragraph of his statement. *See* [283] at 10 ¶ 27. The phrase is misleading, argues Bonner, because its meaning is unclear and no definition is given. *See id.* At his deposition, however, O'Toole testified that to say a place is "back up" means, in "street terminology," that drug sales are again occurring from an apartment after the police have already raided it. *See* [279-13] at 55, Tr. at 216. This is the testimony on which defendant's Rule 56.1 statement relies, and its meaning is sufficiently clear. Bonner also objects that the statement is misleading (and so should be stricken) because O'Toole never testified that the informant spoke about a particular address where drug sales were supposedly "back up." But it is apparent enough from O'Toole's testimony that the informant was speaking of one of the previously-searched apartments discussed above, *see* [279-13] at 55, Tr. at 216 ("[The c]onversation had to do with the . . . first two apartments that she had given me as far as narcotics investigation. . . . She [told] me about the same apartment, indicating that it was back up . . . ."). The statement will not be stricken.

[4] Bonner denies that the John Doe ever said this to O'Toole, since O'Toole did not include this information in his complaint for a search warrant. *See* [283] at 12 ¶ 33. The significance of O'Toole not including this information in the warrant papers will be addressed later in this opinion.

Based on the information provided by the John Doe, O'Toole prepared two additional affidavits and corresponding warrants, *see* [283] at 11 ¶ 29: one for "[t]he entire 1st floor apartment of the three flat building located at 4927 W. Adams" (again to search the apartment of the woman known as "Neesh"), *see* [279-7]; and the other for "[t]he entire 1st floor apartment of the three flat building located at 4929 W. Adams" (to search Shu-Shu's apartment), *see* [297-8].[5] The affidavit supporting the warrant to search the apartment at 4929 W. Adams read as follows:

> I, Officer Daniel O'Toole[,] have been a Chicago police officer for the past nine years. During the past nine years I have made numerous narcotics and weapons related arrests.
>
> On 12 Feb 2010, I had an opportunity to speak with an individual that I will refer to as John Doe. John Doe has admitted to me to be a user of Cocaine for over five years. During the last year and within the past 24 hours, John Doe has purchased and used Cocaine he bought from the above address [the entire 1st floor apartment of the three-flat building located at 4929 W. Adams, Chicago, Illinois, Cook County] from an individual by the name of "Shu-Shu". John Doe has known "Shu-Shu" for three years.
>
> On 12 Feb 2010, John Doe went to "Shu-Shu" for the purpose of purchasing Cocaine. John Doe stated he typically purchases two "rocks" (street terminology for Crack Cocaine") for 20.00 U.S.C. John Doe informed me . . . that on 12 Feb 2010 he had an opportunity to purchase Cocaine from the above listed person ("Shu-Shu") at the above listed address 4929 W. Adams (1st floor). John Doe stated he went to the above listed residence and "Shu-Shu" opened the door and told John Doe to come inside. Once inside of the residence, "Shu-Shu" asked John Doe what he wanted, John Doe then stated a "two rocks" (common street terminology for Crack Cocaine). "Shu-Shu" then told

---

[5] As drafted on February 12, 2010, the address on the second warrant also said "4927 W. Adams" (not "4929"). *See* [279-8] at 1. The judge to whom the warrant and affidavit were presented, however, handwrote a "9" over the "7" (and initialed the change) so that the address on the warrant would match the address in the underlying complaint. *See* [283] at 12 ¶ 35.

John Doe to grab a "Nike shoebox" from on top of her television set which contained numerous plastic bags, containing suspect Crack Cocaine. "Shu-Shu" then told John Doe to grab two bags for himself out of the shoebox. After John Doe removed the two bags of Crack Cocaine from the shoebox . . . he then handed "Shu-Shu" $20.00 . . . U.S.C in return. "Shu-Shu" then told John Doe to put the "Nike shoebox" back on the television. John Doe then left the residence and went to an undisclosed location and used a portion of the Crack Cocaine that John Doe had just purchased from "Shu-Shu". John Doe stated that John Doe received the same euphoric feeling as John Doe has received in the past after ingesting Crack Cocaine.

On today's date, John Doe accompanied R/O and R/O's partner in [a] covert vehicle and drove to the 4900 block of W. Adams. John Doe pointed to 4929 W. Adams (1st floor) and stated "that's where Shu-Shu stays".

[279-8] at 2–3. Also on February 12, 2010, O'Toole brought the John Doe informant before the same judge who had signed the January 27 warrants. *See* [283] at 13 ¶ 36. The judge placed the informant under oath and spoke with her, but when asked at his deposition, O'Toole could not recall any specific questions the judge may have posed, or if the informant provided to the judge any information not otherwise included in the affidavits prepared by O'Toole. *See id.*; *see also* O'Toole Deposition, [279-13] at 62–63, Tr. at 247–48. The judge signed both warrants. *See* [283] at 13 ¶ 36.

Later that evening, O'Toole and several other police officers executed the search warrants for 4927 (first-floor apartment) and 4929 W. Adams (also the first-floor apartment). *See id.* ¶ 39. Upon entering the building at 4929, the officers approached the first door on the right—which is where the informant had said Shu-Shu's apartment would be—knocked several times and announced their presence; when no one responded, they forced open the apartment door with a battering ram.

*See id.* at 12 ¶ 33; *id.* at 16 ¶ 48; *id.* at 19 ¶ 60. The officers searched the apartment for drugs, but did not find any. *See id.* at 21 ¶¶ 65, 67.

One of the officers left a copy of the search warrant in the apartment, *see* [291] at 21 ¶ 74, and the team exited; they did not lock the door to the apartment because the door had been damaged from their forcible entry and could no longer be locked, *see id.* ¶ 75. At some point during the search, though, Michael Dudley—the maintenance technician for the buildings at 4923–4929 W. Adams, *see* [283] at 6 ¶ 14—had arrived, *see id.* at 29 ¶ 94. After the police were done searching the apartment, Dudley measured the broken front door, went to his shop (across the alley) to cut boards for boarding it up, and returned to put the boards in. *See* [291] at 22 ¶ 77; December 3, 2012 Deposition of Michael Dudley, [279-14] at 24, Tr. at 96.[6]

As it turned out, the person who lived in that apartment was not a woman called "Shu-Shu," but a man named Sylvester Bonner, *see* [291] at 2–3 ¶¶ 7–8. (Shu-Shu, it seems, did live at 4929 W. Adams, but in an apartment on a higher floor. *See id.* at 20 ¶¶ 68–69.) Nor was Bonner's apartment technically a "first-floor" apartment. Bonner lived in a "B"-level apartment (where "B" signifies "basement"): the "1"-level apartments were up a flight of stairs. *See id.* at 2 ¶ 7; *id.* at 4 ¶ 14; *id.*

---

[6] The parties dispute whether the police *asked* Mr. Dudley to board up the apartment door, or whether Mr. Dudley did so of his own accord. According to O'Toole, Dudley made an agreement with one of the officers that Dudley would "fix and seal up" the broken door. *See* [283] at 29 ¶ 93. When asked at his deposition, however, Dudley testified that there was no conversation per se about fixing the door; rather, the police told him, "you got a door to fix," and Dudley did so because "[t]hat's [his] job." *See* Dudley Deposition, [279-14] at 4–5, Tr. at 16–17.

at 6 ¶ 20. In fact, there were two apartments—not one—on each floor. *See id.* at 4 ¶ 14. So Bonner's apartment was one of two at the "B"-level. *See id.* (noting that in addition to Bonner's "BA" unit there was also a "BB" unit—as well as "A" and "B" apartments on each of the three upper levels).

When Bonner came home to his apartment on February 12, 2010, he found the door to his unit boarded up and his belongings in disarray. *See id.* at 22–23 ¶ 79. The linings of his fur coats had been cut open, and several of his personal effects–a computer, cell phone, and sound system—were missing. *See id.*

**B.**     **Practices and Policies of the Chicago Police Department**

Chicago Police Department policies are set forth in various "orders." *See* [293] at 1 ¶ 82. "General" orders are issued by the Superintendent of Police, while "special" orders may be issued by the Superintendent or by the Director of the Research and Development Division (in the Superintendent's name). *See id.* Both must by followed by all Chicago police officers. *See id.* ¶ 83.

In 2006, the Police Department revised its special order concerning search warrants, resulting in a new special order on that topic: "Search Warrant and Consent to Search Incidents" (CPD SO 07-06). *See id.* at 2 ¶ 85. The new order issued on June 1, 2007, and was still in effect when the officers searched Bonner's apartment on February 12, 2010. *See id.* ¶¶ 85, 87. Special Order 07-06 defined three types of search warrants, each based on the type of individual from whom the police obtained the information underlying the warrant: Registered Cooperating

Individual; Unregistered Cooperating Individual; and John Doe Informant. *See id.* at 4 ¶ 96; *id.* at 5 ¶ 98.

A Registered Cooperating Individual is an informant who has in the past provided the police with information about criminal activity, and whose information has been verified and documented. *See id.* at 5 ¶ 99. A file must be maintained for each Registered informant, including copies of any prior reports that led to an arrest or recovery of evidence, crime-lab reports for such evidence, and any search warrants that issued as a result of that informant's tips. *See id.* ¶¶ 100–01. A similar file must be kept for each Unregistered informant. *See id.* The primary difference between Registered and Unregistered informants is that the former are paid for their information, while the latter are not. *See id.* at 6 ¶ 102.

Unlike for Registered or Unregistered informants, no files or records are kept for John Doe informants. *See id.* ¶ 104. Officers are not required to obtain from a John Doe any identifying information, or information about how or where he or she might later be found. *See id.* at 10 ¶ 116. Although officers must, through "an independent investigation," verify and corroborate the information provided by a John Doe, *see* [288] at 3 ¶ 7; Chicago Police Department Special Order 07-06, [279-16] at 3 ¶ IV(A)(1)(c), there is no written policy as to what such an investigation should or must include, *see* [293] at 12 ¶ 122.

While Special Order 07-06 addresses the execution of search warrants in general, *see* [279-16] at 9–14, there is no department procedure for abandoning a search of someone's residence if and when it appears to the officers that they are in

the wrong building or apartment, *see* [293] at 14 ¶ 131. Officers-in-training receive PowerPoint presentations on search warrants, but the presentations do not expressly instruct officers to abandon a search in such a scenario. *See* [287] at 8; [292] at 9–10. The presentations do, however, cover "address issues." *See* Excerpt from "Search Warrants Introduction," [279-9] (listing "issues" such as courtyard buildings, first floor versus ground floor, and lack of a visible address). The department has received and investigated complaints of officers searching the wrong address, and there is a process (through the City Clerk) through which complainants may seek money damages for such errors. *See* [288] at 8 ¶ 26; May 25, 2013 Deposition of Sergeant Ray E. Borderdorf, [285-12] at 18, Tr. at 69; March 13, 2014 Deposition of Nicholas J. Roti, [285-9] at 27, Tr. at 102; [293] at 14 ¶ 131.

## C.    Procedural History

In 2012, Sylvester Bonner sued Officer O'Toole (as well as various "unknown officers" of the Chicago Police Department) under 42 U.S.C. § 1983, alleging that the officers' conduct on February 12, 2010 had violated Bonner's Fourth Amendment rights. *See* Complaint, [1] at 1 ¶ 1; *id.* at 5–15 (Counts I–V).[7] Bonner also brought a civil-conspiracy claim against the officers, alleging that they had made an agreement to violate his rights. *See id.* at 15–17 (Count VI). In addition, Bonner claimed that the officers' conduct was a product of the policies, practices,

---

[7] Bonner divides his Fourth Amendment claim into multiple counts. *See, e.g.*, [1] at 5 (Count I) ("Unconstitutional Entry of Home"); *id.* at 7 (Count II) ("Unconstitutional Search of Home"). The various counts are all alternative methods of proving a Fourth Amendment violation.

and procedures maintained by the Chicago Police Department, and named as an additional defendant the City of Chicago under *Monell. See generally* [1]; *see also* [276] at 2.

Officer O'Toole and the City of Chicago move (separately) for summary judgment on the claims against them. [251] (O'Toole's motion); [268] (the City's motion). Bonner moves for summary judgment on all counts, against both parties. [276].

## III. Analysis

### A. Bonner's Claims Against Officer O'Toole

#### 1. *The Fourth Amendment Claim*

Bonner claims that the warrant Officer O'Toole obtained to search "[t]he entire 1st floor apartment" at 4929 W. Adams was invalid because O'Toole did not have probable cause to search that location. *See* [277] at 6–11. A police officer has probable cause to search a location when the facts available to him would warrant a person of reasonable caution in believing that contraband or evidence of a crime is present there. *See Florida v. Harris*, — U.S. —, 133 S.Ct. 1050, 1055 (2013) (citing *Texas v. Brown*, 460 U.S. 730, 742 (1983); *Safford Unified Sch. Dist. # 1 v. Redding*, 557 U.S. 364, 370–71 (2009)). The totality of the circumstances need not indicate an absolute certainty (or even a preponderance of the evidence) that evidence of a crime will be found; only a reasonable probability is needed. *See United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010) (citing *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).

If, as here, an affidavit is the only evidence presented to a judge in support of a search warrant, then "the validity of the warrant rests solely on the strength of the affidavit," *United States v. Peck*, 317 F.3d 754, 755–56 (7th Cir. 2003) (citing *United States v. Roth*, 391 F.2d 507, 509 (7th Cir. 1967)). Where the affidavit is based on an informant's report, the district court considers five primary factors in evaluating the credibility of that report (and thus the extent to which it may reasonably support a finding of probable cause): (1) the level of detail provided by the informant: (2) the extent to which the informant observed those details firsthand; (3) the degree of corroboration by the officer; (4) the time between the events reported and the application for the warrant; and (5) whether the informant appeared or testified before the judge who signed the warrant. *See United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014) (citing *United States v. Johnson*, 655 F.3d 594, 600 (7th Cir. 2011)); *see also Peck*, 317 F.3d at 756 (citations omitted). No one factor is determinative; "a deficiency in one . . . may be compensated for by a strong showing in another." *Peck*, 317 F.3d at 756 (quoting *United States v. Brack*, 188 F.3d 748, 756 (7th Cir. 1999)).

When Officer O'Toole prepared the affidavit and search warrant for the first-floor apartment at 4929 W. Adams, he had recently relied on tips provided by the same John Doe informant who provided the tip about "Shu-Shu." The previous tips had resulted in positive searches for drugs at the 4923–4929 W. Adams Complex. An informant's previous dealings with the police may lend credibility to her story, *see United States v. Searcy*, 664 F.3d 1119, 1123 (7th Cir. 2011), but O'Toole

neglected to mention any such dealings in his affidavit. He stated only that he had "had an opportunity to speak with an individual that [he would] refer to as John Doe." [279-8] at 2. Since, in evaluating the totality of the circumstances in informant cases, courts typically concern themselves only with the content of the affidavit, *Glover*, 755 F.3d at 816 (citation omitted), O'Toole's prior encounters with the John Doe cannot bolster the credibility of her report.[8]

But the affidavit nevertheless contained sufficient indicia of reliability to support a finding of probable cause. The information provided by the John Doe was detailed: she described when and where she claims to have purchased an illegal substance (on February 12, 2010, in the first-floor apartment at 4929 W. Adams), how much she bought (two "rocks"), and how much she spent ($20.00). *See* [279-8] at 2–3. She also explained that she was able to identify the substance she purchased as crack cocaine (she ingested some of the drug), and provided a reasonable explanation for why she was able to do so (she had been a cocaine-user for more than five years, and felt when she ingested the substance here "the same euphoric feeling" she had experienced when using cocaine in the past). *See id.*; *cf. United*

___

[8] As it turned out, the judge before whom O'Toole and the John Doe appeared on February 12, 2010, was the same judge who signed the warrants (and the same judge before whom O'Toole and the informant appeared) on January 27, 2010—*i.e.*, the very same warrants that led to positive searches for contraband at 4925 and 4927 W. Adams. Thus, it is conceivable that the judge recognized the John Doe on February 12 as the same John Doe who had appeared before her on January 27. But there is no evidence suggesting that the judge did indeed recognize the informant, or that the judge otherwise knew (or was told) that the searches based on the January 27 warrants had yielded positive results. In any event, whether the judge realized that O'Toole was relying on the same John Doe, and that Doe's information had in the past been reliable, is ultimately irrelevant since, as discussed below, the affidavit from February 12 contained other indicia of reliability.

*States v. Bell*, 585 F.3d 1045, 1050 (7th Cir. 2009) (concluding that an informant's story was not reliable in part because it was "unclear [from the affidavit] how [the informant] was able to identify the substance . . . as crack cocaine"); *Peck*, 317 F.3d at 756 (determining there was insufficient evidence to support a finding of probable cause, in part because the police officer's affidavit "failed to explain why [the John] Doe knew that the substance in question was an illicit drug"). Moreover, John Doe's statement that she purchased crack cocaine was a statement against her penal interests—a further indication that her account was a truthful one. *See, e.g.*, *United States v. Lake*, 500 F.3d 629, 633 (7th Cir. 2007) (citation omitted); *United States v. Jones*, 208 F.3d 603, 609 (7th Cir. 2000).

The John Doe's statement here also included specific details about where in the apartment the drugs were supposedly kept (in a Nike shoebox on top of the television). *See* [279-8] at 3; *cf. Peck*, 317 F.3d at 756 (noting that an informant's story lacked sufficient detail because, among other things, it "failed to give specific[s] about . . . where the drugs were hidden"); *Glover*, 755 F.3d at 817 (similar). The John Doe explained how she and the suspected drug dealer, "Shu-Shu," purportedly knew each other (the informant had purchased cocaine from Shu-Shu in the past), *see* [279-8] at 2, and described the repetitive nature of their dealings, *see id.* (stating that John Doe had made such purchases "[d]uring the last year"). These statements, too, lent credence to the informant's story. *Cf. Bell*, 585 F.3d at 1050 (concluding that an affidavit did not establish the reliability of an informant where, among other things, it "did [not] give any information about the

nature of [the] relationship" between the informant and the supposed drug dealer). So, too, did the fact that the transaction was (purportedly) a recent one, *see* [279-8] at 2 ("within the past 24 hours"), and was experienced by the John Doe firsthand. Moreover, the John Doe appeared before and spoke to the state-court judge, giving the latter an opportunity to assess the former's credibility. *See* [283] at 13 ¶ 36. This tended to show reliability, as well.[9]

Bonner argues that the informant's tip was unreliable because the police did little to corroborate her story. True, the only evidence of corroboration is the statement in O'Toole's affidavit that he and another officer drove the John Doe past the 4900 block of W. Adams Street, where she allegedly pointed to the first floor of the 4929 building and said, "[T]hat's where Shu-Shu stays." *See* [279-8] at 3. Although the drive-by gave the officers at least some information, it "shed[] little light on the central question" of whether drugs were actually being sold at the location indicated. *United States v. Robinson*, 724 F.3d 878, 884 (7th Cir. 2013) (citing *United States v. Dismuke*, 593 F.3d 582, 587–88 (7th Cir. 2010)). But

_____

[9] Bonner notes that when asked at his deposition, O'Toole could not recall whether the John Doe may have said anything to the judge "in addition to what [was] set forth in the complaint[]" for the warrant to search the apartment at 4929 W. Adams. *See* [283] at 13 ¶ 36 (citing O'Toole Deposition, Tr. at 247–48); *see also* O'Toole Deposition, [279-13] at 62–62, Tr. at 247–48 ("Q. Can you recall anything the John Doe informant said to the judge, other than what is set forth in the complaint . . . ? A. I cannot recall."). But Bonner does not dispute that the judge interviewed the informant, under oath. *See* [283] at 13 ¶ 36. That the John Doe appeared before the state-court judge and was questioned by her is what is important here. *See Lake*, 500 F.3d at 633 (determining that there was enough evidence to find that the state-court judge had assessed the informant's credibility—an "important factor in determining whether probable cause is established on the basis of an informant's tip"—where it was shown that the state-court judge "always questioned informants who came before her") (citation omitted).

extensive corroboration is not the only factor to be considered in determining reliability; and where corroboration is lacking, a high level of detail in the informant's story—as is present here—may compensate, *see Bell*, 585 F.3d at 1051 ("The questions surrounding . . . reliability are best answered with specifics . . . *or* independent corroboration of the facts . . . disclosed . . . .") (emphasis added); *see also Peck*, 317 F.3d at 756 ("None of the[] factors is determinative . . . .").

On balance, a reasonable person could consider the John Doe's statements worthy of credence, and so her statements may serve to establish probable cause. *See United States v. Koerth*, 312 F.3d 862, 867–68 (7th Cir. 2002) (citing *Gates*, 462 U.S. at 238). Indeed, her statements did establish probable cause to search the first-floor apartment at 4929 W. Adams, since they suggested a reasonable probability that contraband would be found there.

But did the resulting search warrant describe that location with the requisite particularity? The Fourth Amendment prohibits the issuance of a warrant unless it "particularly describe[s] the place to be searched." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (quoting U.S. Const. amend. IV); *see also United States v. Kelly*, 772 F.3d 1072, 1081 (7th Cir. 2014). The particularity requirement protects against wide-ranging, exploratory searches, and ensures that a place will be searched only if there is probable cause to search it. *See Garrison*, 480 U.S. at 84. Where a building is divided into multiple residential units, as here, the probable-cause determination must be specific to a particular unit or units; probable cause to search one unit does not by itself create probable cause to search the remainder. *See Jacobs v. City of*

*Chicago*, 215 F.3d 758, 767 (7th Cir. 2000) (citing *United States v. Butler*, 71 F.3d 243, 248 (7th Cir. 1995); *Garrison*, 480 U.S. at 85).

Officer O'Toole's affidavit established probable cause to search the "entire 1st floor apartment of the three-flat building located at 4929 W. Adams," [279-8] at 1. As it turned out, this description was quite vague: not only did the building at 4929 have four floors of apartments instead of three (as the term "three-flat" implies)— indeed, the building is part of a U-shaped apartment complex and is not really a three-flat at all—but there were in fact *two* apartments on each floor, not one. But the Fourth Amendment does not require exact precision. To satisfy the particularity requirement, the warrant need only provide enough description that an officer executing the search warrant can identify the place intended with reasonable effort. *See Kelly*, 772 F.3d at 1081 (quoting *Steele v. United States*, 267 U.S. 498, 503 (1925)); *United States v. Jones*, 54 F.3d 1285, 1292 (7th Cir. 1995) (citation omitted). Minor errors will not invalidate the warrant as long as there is "no danger that the officers might inadvertently search the wrong place." *Kelly*, 772 F.3d at 1081; *United States v. Johnson*, 26 F.3d 669, 694 (7th Cir. 1994) (concluding that an omission from the warrant was "not fatal [because] there was no risk that . . . officers executing the warrant would search some other house") (citation omitted).

Whether the particularity requirement has been satisfied depends not on facts or mistakes discovered after the warrant issued, but on what the officers knew or should have known—and thus what they disclosed or had a duty to disclose to the judge—at the time when the warrant issued. *See United States v. White*, 416

F.3d 634, 638 (7th Cir. 2005) (citing *Garrison*, 480 U.S. at 85–86); *see also Guzman v. City of Chicago*, 565 F.3d 393, 396 (7th Cir. 2009) (citation omitted). What did Officer O'Toole know, or what should he have known, when he presented to the state-court judge his complaint for a warrant to search the first-floor apartment at 4929 W. Adams? Bonner argues that O'Toole should have told the state-court judge that there were two apartments on each floor of that building. *See* [277] at 11. If O'Toole had done so, says Bonner, the judge likely would not have signed a warrant describing the "entire 1st floor apartment" of that building. *See id.*; *see also id.* at 4–5. Perhaps not, but recall that when the warrant for Shu-Shu's apartment issued, O'Toole had already searched two buildings in the same complex (4925 and 4927 W. Adams, on January 27, 2010), and those buildings did *not* have two residential units per floor. *See* [291] at 3 ¶ 10 (explaining that both 4925 and 4927 W. Adams had apartments designated "1," "2," and "3"). Thus, in preparing the affidavit for the 4929 warrant, it was not unreasonable for Officer O'Toole—at least insofar as the number of apartments per floor was concerned—to rely on his memory of how other addresses in the same U-shaped building complex were laid out. His failure to discover and report to the state-court judge the presence of two apartments per floor does not suggest any reckless disregard for the truth by O'Toole. *See Johnson*, 26 F.3d at 694 (explaining, in the context of the particularity requirement, that a warrant may be invalidated where the affiant has made representations stemming from an intentional or reckless disregard for the truth (citing *Franks v. Delaware*, 483 U.S. 154, 155, 171 (1978))); *see also United States v. Norris*, 640 F.3d 295, 301

(7th Cir. 2011) (observing that warrant affidavits need be truthful "in the sense that the information put forth is *believed or appropriately accepted* by the affiant as true" (quoting *Franks*, 438 U.S. at 165)) (emphasis added).

Things get murkier, however, when it comes to describing the target apartment as a "1st floor apartment." O'Toole asserts that, to him (and others), "first floor" means "ground floor," and it is not unreasonable to believe that a building's ground floor is in fact its "first floor." *See* [290] at 2–3. O'Toole is correct that in many situations it would not be illogical to use "first floor" and "ground floor" interchangeably. Nor would it have been unreasonable, in viewing the exterior of the building at issue here, to believe that the lowest apartment unit at 4929 W. Adams (Bonner's unit, it turns out), was at ground level. *See* [279-1] at 1.[10]

But Officer O'Toole had already requested a warrant to search, and had in fact searched, a "first-floor" apartment at the 4923–4929 W. Adams complex: the first-floor unit at 4927 W. Adams. *See* [279-6]. To do so, he and his team had to go up several stairs. *See* [291] at 6–7 ¶¶ 21–22. And not just one or two: exterior photographs of the 4927 building reveal that the lowest-level apartment at 4927 W. Adams is substantially above ground; indeed, it is level with the story that sits *on top of* the "ground"-level unit at 4929 W. Adams. *See* [279-1] at 1. When O'Toole

---

[10] Bonner contends that his unit was not precisely at ground level, but was instead partially below ground—a basement apartment. *See* [283] at 23–24 ¶ 74. From the outside of the building, however, a reasonable person could classify the apartment as a ground-level unit: the windows of the lowest-level unit appear to be the same size as the windows for the higher-level units, and appear (from the street) to be completely above ground, *see* [279-1] at 1.

prepared the affidavit for the search warrant at 4929, he therefore knew that, with respect to at least some buildings in the 4923–4929 W. Adams complex, "first floor" could mean the level *above* ground level. Armed with that information, O'Toole knew (or at least should have known) that if he described the lowest-level apartment—the apartment he intended to search based on John Doe's information—as a "1st floor apartment," [279-8] at 2, without further specificity, there was at least some risk or danger that officers executing the warrant would search a "1"-level apartment one flight up. Looking just at the warrant, an executing officer would not know whether the premises to be searched was a basement ("B"-level) apartment or a 1st-floor apartment. Based on the specific design of this apartment complex and O'Toole's prior knowledge of its layout, the warrant did not satisfy the particularity requirement of the Fourth Amendment, and so was invalid when it issued.

O'Toole argues that the particularity requirement was satisfied, and that the warrant was therefore valid, because the officers executing the warrant learned at a "pre-raid meeting" that their target was on the lowest floor. *See* [290] at 5. This was based on information that the John Doe informant had purportedly provided to O'Toole, and which apparently was then passed on to the executing officers before they began their search. *See* [283] at 12 ¶ 33; *id.* at 14 ¶ 44. While it is true that in some cases particularity may be provided by "the executing officer's knowledge that there was a particular place to be searched," *Jones*, 54 F.3d at 1292, this is not such a case. In order for an executing officer's personal knowledge to supply needed

particularity, that information must also have been provided to the judge who signed the warrant. *See id.* (citing *United States v. Nafzger*, 965 F.2d 213, 215 (7th Cir. 1992)). O'Toole did not include in the warrant or underlying affidavit any of the informant's instructions about looking for Shu-Shu's apartment on the lowest floor, and there is no evidence that the judge who signed the warrant knew about those instructions. The warrant, consequently, was invalid for lack of particularity.

Even if a warrant was invalid when it issued, searches pursuant to that warrant may still be constitutional if the officers who conducted the search "manifested an objective good-faith belief in [its] validity." *Jones v. Wilhelm*, 425 F.3d 455, 464 (7th Cir. 2005) (citing *United States v. Leon*, 468 U.S. 897, 926 (1984)). But no such belief can be shown where, prior to executing the warrant, the officer knew or should have known that the warrant lacked sufficient particularity. *See id.* at 464–65; *cf. Guzman*, 565 F.3d at 397 ("A warrant cannot be executed by persons who know it to be ambiguous.") (citations omitted). Because O'Toole should have known from his recent searches at the 4923–4929 W. Adams complex that the "first floor" descriptor was open to more than one interpretation, he cannot now seek shelter in the good-faith exception. Nor is he entitled to qualified immunity. It was clearly established as of February 2010 that O'Toole could not legally execute a warrant that he knew or should have known to be ambiguous. *See Jones*, 425 F.3d at 464–65. And only where government conduct does not violate the plaintiff's "clearly established" constitutional rights is that conduct protected by qualified immunity. *See Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013)

(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Groh v. Ramirez*, 540 U.S. 551, 563 (2004) (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *receded from on other grounds as stated in Pearson v. Callahan*, 535 U.S. 223 (2009)).[11]

### 2. Damage to Bonner's Property and Bonner's Missing Property

Bonner moves for summary judgment only as to liability, not as to damages. *See* [276]; [277] at 1. So Bonner need not prove the extent of his injuries at this stage of the litigation; those issues must be tried. Nonetheless, Bonner claims that he suffered several types of harm, and it may be that O'Toole cannot be held liable, as a matter of law, for certain of those injuries.

As a general matter, O'Toole's liability must stem from his personal involvement in the violation of Bonner's constitutional rights: O'Toole must have caused, or have participated in, the constitutional deprivation. *See Harper v. Albert*, 400 F.3d 1052, 1062 (7th Cir. 2005) (citing *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003); *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000)). O'Toole procured, and then participated in the execution of, a warrant he knew or should have known was ambiguous. O'Toole is therefore liable for any injuries caused by the execution of that warrant. Causation has two elements: (1) cause in fact (or but-for cause)—that is, the injury would not have occurred absent the defendant's conduct; and (2) proximate cause. *Whitlock v. Brueggemann*, 682 F.3d

---

[11] The court makes no finding as to whether, in describing Shu-Shu's apartment as a first-floor apartment, O'Toole intentionally misrepresented the premises to be searched or acted in reckless disregard for the truth. Such a finding is unnecessary to resolve the parties' motions since O'Toole's mistake of executing a warrant he knew or should have known to be ambiguous placed him outside the protections of qualified immunity.

567, 582 (7th Cir. 2012) (quoting *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 640 n. 1 (7th Cir. 2008)). Proximate cause turns on foreseeability; a defendant may be held liable "only for those injuries that might have reasonably been anticipated as a natural consequence of [his] actions," *Boim v. Quranic Literacy Inst. and Holy Land Found. for Relief and Dev.*, 291 F.3d 1000, 1012 (7th Cir. 2002) (citing *Suzik v. Sea-Land Corp.*, 89 F.3d 345, 348 (7th Cir. 1996); Restatement (2d) of Torts, §§ 440–47).

Bonner contends that the search of his apartment caused four kinds of injuries. His front door was broken, his personal belongings were left in disarray, the linings of his fur coats were cut open (as though the officers were looking for drugs), and several pieces of electronic equipment (a computer, cell phone, and sound system) were stolen. *See* [291] at 22 ¶ 79. As for Bonner's front door, no one disputes that the officers damaged it when they forcibly entered his apartment, and that the lock was broken when they left. *See* [283] at 19 ¶ 60; [291] at 21–22 ¶ 75. A forced entry is a foreseeable consequence of executing a warrant, and damage to a front door (or its lock) is a foreseeable consequence of such an entry. This injury is compensable. And if Bonner can establish at trial that a reasonable police officer might have anticipated as a natural consequence of a drug raid the scattering of Bonner's personal belongings, or the slashing of the inside of his coats, then these injuries, too, would be compensable under Section 1983.[12]

---

[12] O'Toole argues that Bonner should not be awarded summary judgment as to the damaged fur coats since Bonner has not provided any evidence that they were ever repaired. *See* [290] at 13. But the question to be answered at this stage is not how much the coats were damaged, but whether O'Toole can be held liable for that damage in the first place.

The missing electronics—the computer, cell phone, and sound system—present a more complicated question. Bonner maintains that a third party came into his apartment and stole these items after the officers left his apartment unlocked (since the lock was now broken) and unsecured. *See* [277] at 16; [283] at 21–22 ¶ 75.[13] If true, the theft would certainly be a but-for result of the officers' search. If the officers had not executed the warrant and so had not entered Bonner's apartment, his front door would not have been broken and his apartment would not have been vulnerable, or at least *as* vulnerable, to a break-in. Cause in fact, though, is but one part of causation, and Bonner must also show that the theft of his electronics was proximately caused by O'Toole's unconstitutional conduct. This Bonner cannot do because, to the extent the theft was a foreseeable consequence of police action, it was a foreseeable result only of the officers' failure to properly secure Bonner's apartment—a failure that occurred *after* the police had concluded their search, and thus after the unconstitutional conduct had come to an end.

---

[13] Bonner frames the disappearance of his electronic equipment as a "seizure" under the Fourth Amendment. *See* [277] at 16–17. A seizure of property is a "meaningful interference with an individual's possessory interests in that property." *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 809 (7th Cir. 2005) (quoting *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992)). If someone permanently removed Bonner's items from his home, that was indeed a seizure under the Fourth Amendment. *See id.* However, Fourth Amendment protections do not generally apply "to a search or seizure . . . effected by a private individual." *Id.* (quoting *United States v. Jacobsen*, 466 U.S. 109, 113–14 (1984)). And Bonner does not contend that the police officers themselves took the now-missing items. *See* [277] at 16–17. Since there was no state action, Bonner cannot prevail on a Fourth Amendment seizure action under Section 1983. *See Pepper*, 430 F.3d at 809. The issue is only whether the alleged theft was a foreseeable consequence of the state action described above—the officers' unlawful search.

Because the failure to secure Bonner's front door was not part of the constitutional violation, the resulting theft is not an actionable injury under Section 1983.[14]

The parties' motions for summary judgment on Bonner's Fourth Amendment claim are therefore granted in part and denied in part. Bonner's motion is granted (and O'Toole's cross-motion denied) insofar as it concerns liability for the damage to Bonner's door and personal effects. Bonner's motion is denied (and O'Toole's motion granted) insofar as it pertains to liability for the theft of the electronic equipment.

### 3. *The Conspiracy Claim*

Bonner also claims that Officer O'Toole conspired with the other officers who executed the search warrant to violate Bonner's constitutional rights. *See* [1] ¶ 61. A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (quoting *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)). To prove that O'Toole and the other officers engaged in a conspiracy, Bonner must show: (1) that those individuals reached an agreement to deprive Bonner of his constitutional rights; and (2) overt acts in furtherance of that agreement, which actually deprived Bonner of those rights. *See id.* (citing *Scherer*, 840 F.2d at 442). Bonner has presented no evidence of any such agreement, and makes no argument on this issue. Accordingly, Bonner's motion for summary judgment on the conspiracy claim is denied. Bonner

---

[14] If, in neglecting to properly secure Bonner's door, the officers intentionally or recklessly disregarded Bonner's constitutional rights, Bonner might have a due-process claim actionable under Section 1983. *See Bonner v. Coughlin*, 545 F.2d 565, 567 (7th Cir. 1976) (en banc). But Bonner has brought no such claim, and in any event, Bonner would have to establish O'Toole's personal involvement in the failure to secure the door, which Bonner has not done.

presumably marshaled all of his favorable evidence in moving for summary judgment, and there is no evidence from which a jury could conclude the existence of an agreement. Under these circumstances, summary judgment in favor of O'Toole would be appropriate. But O'Toole also neglected to address the conspiracy claim. The civil-conspiracy claim against O'Toole therefore remains pending.

## B. Bonner's Claims Against the "Unknown Officers"

The officers with whom O'Toole allegedly conspired (and who purportedly entered and searched Bonner's apartment with O'Toole) are named in Bonner's complaint as "unknown officers" of the Chicago Police Department. *See* [1] ¶¶ 10–11. If, at the time he files suit, a plaintiff does not know the name of the police officer who allegedly wronged him, he may file a complaint against an "unknown" or "unidentified" officer and later amend his complaint to reflect that officer's name once it has been discovered. *See Hines v. City of Chicago*, 91 F. App'x 501, 502 (7th Cir. 2004). The amendment, however, must be completed before the close of discovery. *See Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007). Discovery in this case has long since closed, *see* [217], [218]; *see also* Joint Re-Assignment Status Report, [246] at 2 ¶ 2(b); but Bonner has not amended his complaint. The unidentified officers are therefore dismissed from the case. *See Williams*, 509 F.3d at 402.

## C. The City's Liability Under *Monell*

Bonner contends that O'Toole's unconstitutional behavior was a product of policies, practices, or procedures maintained by the Chicago Police Department, and

so alleges that the City of Chicago is liable for that behavior. Accordingly, Bonner brings a claim against the City of Chicago under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 665 (1978). *See generally* [1]; *see also* [276] at 2 ¶ 3(g). Municipalities may be held liable for monetary damages under Section 1983 if the constitutional violation at issue was caused by an official policy, a widespread and well-settled practice or custom, or an official with final policy-making authority. *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690; *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 674 (7th Cir. 2009)). For liability to attach, the municipal policy, practice or custom must be "the moving force behind the deprivation of constitutional rights." *Wilson v. Cook Cnty.*, 742 F.3d 775, 779 (7th Cir. 2014) (quoting *Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012)).

### 1.     *The City's Liability for the Fourth Amendment Violation*

Bonner argues that various Chicago Police Department policies and procedures (or lack thereof) were the moving force behind the violation of his Fourth Amendment rights in February 2010. Driving O'Toole's unlawful actions, says Bonner, was the Department's approach to obtaining "John Doe" warrants. Whereas records were kept for Registered and Unregistered informants, including records of previously-provided tips that have led to an arrest or to the recovery of evidence, express departmental policy (in the form of Special Order 07-06) absolved officers of keeping any such records for John Doe informants. The identity of John Doe informants need not even be known, and requirements for verifying the truth of

their information, says Bonner, were at best vague and at worst non-existent in practice. *See* [287] at 3–7. A lack of adequate officer training and discipline merely exacerbated the problem, argues Bonner, since any training on the procurement of "John Doe" warrants simply reflected the express policy described above, and officers cannot be held accountable for failing to vet informants they are not required to investigate thoroughly in the first instance. *See id.* at 7–11.

But even if true that, as a matter of policy or practice, the Chicago Police Department required little (or no) vetting or corroboration of its John Doe informants, this would not render the City of Chicago liable for Bonner's injuries in this case. The infirmity in the search warrant for the first-floor apartment at 4929 W. Adams lay not in O'Toole's reliance on a John Doe informant, but in O'Toole's failure to convey to the state-court judge information he knew or should have known would render the warrant's description of the apartment ambiguous. Although O'Toole did not learn the informant's identity, or include in his affidavit information about the informant's prior tips (which, if included, would have lent further credibility to her report since, as addressed previously, those prior tips had led to the recovery of contraband), there were present in the affidavit other indicia of reliability, and those were sufficient to support the state-court judge's finding of probable cause. Officer O'Toole's reliance on a John Doe informant did not create the constitutional problem here, so the City's policies and practices as to John Doe informants generally cannot have been the moving force behind the violation of

Bonner's rights. Such policies and practices thus cannot be a basis for liability under *Monell*.

Bonner argues that there were other municipal practices responsible for the violation of his constitutional rights in February 2010. City practices concerning the *execution* of search warrants were problematic, says Bonner, because police officers were not trained to abandon or call off a search once it became apparent to them that they were about to search, or were in fact searching, the wrong residence. *See id.* at 7–8.

Recall that the search warrant here permitted search of "[t]he entire 1st floor apartment" at 4929 W. Adams, *see* [279-8] at 1—implying that there was only one such apartment at that level. But as noted above, there were in fact two apartments per floor, including on the ground level where Sylvester Bonner lived.[15] If, in the course of executing the search warrant, the officers obtained information that put them on notice of a lack of particularity in the warrant—such as the existence of separate apartments on the floor—they were obligated to discontinue their search. *See Jones*, 425 F.3d at 464 (citing *Garrison*, 480 U.S. at 86); *see also Guzman*, 565 F.3d at 397–98; *Jacobs*, 215 F.3d at 769. The officers' decision to nonetheless enter Bonner's apartment could indeed be a basis for municipal liability under *Monell*—if

---

[15] To reach Bonner's door, the officers had to make their way through a small vestibule; head toward a flight of stairs; pass one door (immediately to the left of the foot of the stairs); turn to the right at the base of the staircase; and continue down a short stretch of hallway toward another door (Bonner's). *See* [279-1] at 7–8, 10–12.

Bonner can show that a city policy, practice, or custom was the moving force behind that decision.

Bonner argues that the moving force behind the officers' unlawful entry was the City's failure to train the officers in the need to call off a search when it appears that they may be searching the wrong place. *See* [287] at 7. A city's failure to train its employees about their duty to avoid infringing citizens' rights may in limited circumstances supply a basis for municipal liability under Section 1983. *See Connick v. Thompson*, — U.S. —, 131 S.Ct. 1350, 1359 (2011). But failure-to-train claims are the most tenuous of *Monell* claims. *See id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985)). A government's failure to train its employees amounts to an actionable custom or policy only where the failure to train demonstrates a "deliberate indifference to the rights of [those] with whom the [untrained employees] come into contact." *Id.* (quoting C*ity of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)) (first substitution supplied). "Deliberate indifference" exists where the City's policymakers were on notice—whether actual or constructive—that an omission from their training program will cause city employees to violate citizens' constitutional rights. *See id.* at 1360 (citing *Board of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407 (1997); *see also Wilson*, 742 F.3d at 781 ("[A] plaintiff must demonstrate that the municipal action was taken with deliberate indifference to its known or obvious consequences." (quoting *Canton*, 489 U.S. at 388)) (internal quotation marks omitted). The City's decision to continue with that program despite notice of its deficiency is in effect a

decision to violate the Constitution. *See Connick*, 131 S.Ct. at 1360 (citing *Canton*, 489 U.S. at 395).

Ordinarily, deliberate indifference to citizens' rights (as reflected in an omission in a training program) may be shown only through "[a] pattern of similar constitutional violations by untrained employees." *Id.* (citing *Bryan Cnty.*, 520 U.S. at 409). The City of Chicago points to this multiple-incident requirement of proof, arguing that Bonner has failed to meet it. *See* [292] at 2. Indeed, Bonner has not identified a string of instances in which Chicago police officers entered the wrong house or apartment after being put on notice that the warrant was ambiguous as to the targeted search location.

It is possible for a plaintiff to show deliberate indifference without establishing a pattern of similar violations if he can prove that because of a training-program omission, constitutional errors would result with such highly predictable frequency as to render the unconstitutional consequences of that program "patently obvious." *See Connick*, 131 S.Ct. at 1361 (discussing *Canton*, 489 U.S. at 390 n. 10). The frequency of constitutional errors must be "*so* predictable that failing to train . . . amounted to [a] *conscious disregard*" for citizens' rights. *See id.* at 1365 (citations omitted). Otherwise, *Monell* liability would collapse into de facto *respondeat superior* liability—a form of liability unavailable under Section 1983. *See id.* at 1367 (Scalia, J., concurring) (citing *Canton*, 489 U.S. at 392).

As part of their police training, officers were shown PowerPoint presentations about search warrants. Included in one such presentation was a section on "address

issues," with bullet points listing the following, among others: "[c]ourtway buildings"; "[n]o visible address"; "[f]irst floor v. [g]round level." *See* Excerpt from "Search Warrants Introduction," [279-9] at 3. Another slide in the presentation referenced "Wrong House (address or bad description – opens Department and Officers to liability)." *See* [270-10] at FCRL 001484. Also included was a photograph of a multi-address building complex not unlike the complex at 4923–4929 W. Adams, where Bonner lived. *See* [279-9] at 2; [270-10] at FCRL 001471. The police department had in the past received and investigated complaints from citizens that officers had searched the wrong address. *See* Borderdorf Deposition, [270-12] at 3, Tr. at 69:7–:13 (testifying that there have been instances in which a search location was "described in the warrant, the address, and, you know, [the officers] hit the wrong floor or something[;] they make a mistake"); [288] at 10 ¶ 31; Search Warrant Analysis, [270-15] at 2. There was also a process through which citizens could petition the City Clerk for payment of damages when such errors were made. *See* [293] at 14 ¶ 131; Roti Deposition, [285-9] at 27, Tr. at 102:15–:22.

Viewed in Bonner's favor, this evidence plausibly suggests that the City of Chicago was aware that officers executing a search warrant sometimes had difficulties pinpointing the targeted search location based on the description provided in the warrant. But even when considered in the light most favorable to Bonner, the evidence does not reasonably suggest that such errors occurred with such sufficient frequency that the City's training on search-warrant execution amounted to a choice to allow the execution of ambiguous warrants. It is certainly

true that an officer who does not know that he must stop searching if he learns of an ambiguity in the warrant (and who also does not know that (1) he cannot resolve ambiguities by referring to information not presented to the issuing judge, and (2) good faith will not save the search) will likely commit a constitutional violation if not educated—and the City would be well-advised to teach its officers on this point. The record here, however, provides no basis for a jury to conclude that police officers encounter ambiguous warrants so frequently that the City's failure to provide more precise instruction on how to handle that situation exhibited a deliberate indifference to citizens' constitutional rights.

The only evidence in the record that could be said to shed any light on this topic is a report summarizing complaints made about search-warrant executions in 2009. There were 89 complaints about search-warrant executions that year, of which 8 included a report about officers searching the wrong address. *See* [288] at 10 ¶ 31; Search Warrant Analysis, [270-15] at 2, 4. Even if it were assumed from these data that officers searched the wrong address because of an ambiguity in the warrant, the small number of complaints suggests that, to the extent officers were making this error, the mistake was not a frequent one. The evidence, in other words, might plausibly suggest that the City was negligent in failing to train its officers about how to handle ambiguous warrants. But "[a] showing of simple or even *heightened* negligence will not suffice" to show deliberate indifference. *Bryan Cnty.*, 520 U.S. at 407 (emphasis added).

Deliberate indifference "is a stringent standard of fault," *Connick*, 131 S.Ct. at 1360 (citing *Bryan Cnty.*, 520 U.S. at 410), and *Monell* liability should not be premised merely on a government's failure to cover in its educational program a specific constitutional violation in sufficient depth, *see id.* at 1367 (Scalia, J., concurring) (noting that the risk of recurring errors is by itself insufficient to establish municipal liability). In the absence of a pattern of abuses, there must be some other basis to conclude that the City was on notice of likely constitutional violations, and so chose through inaction to violate the Constitution. Such bases are rare. *See id.* at 1361. The hypothetical scenario described in *Canton*, which in theory permits a finding of *Monell* liability based on a single constitutional violation, has been described as one confined to extreme circumstances—*i.e.*, the arming police of officers without telling them about constitutional constraints on shooting fleeing felons. *See id.* at 1367 (Scalia, J., concurring). This case is not extreme in that way. Although Bonner argues that the City provided no training at all on the precise constitutional violation at issue, no reasonable jury could conclude from the evidence presented here that the City was on notice that the deficiency in its training program would obviously cause its personnel to violate people's rights.

As no jury could reasonably infer from the present record that the City was deliberately indifferent to the constitutional rights of its citizens, the City's motion for summary judgment as to municipal liability for the Fourth Amendment violation is granted, and Bonner's cross-motion is denied.

## 2. *The City's Liability for Civil Conspiracy*

The City also seeks summary judgment on its liability for the conspiracy in which Officer O'Toole allegedly engaged. *See* [269] at 10. The City could in theory be held liable for its officers' purported agreement to violate Bonner's rights if it were shown that they did in fact make such an agreement, and that they made it pursuant to a municipal policy, practice or custom. Bonner has presented no evidence of an agreement, and no evidence of a city policy or practice that motivated one. What's more, Bonner has failed to respond at all to the City's arguments that summary judgment should be awarded to them on the conspiracy issue. Because Bonner did not provide to the court any basis on which to decide his *Monell* claim as it concerns the conspiracy allegations, and because he did not respond to the City's arguments on this point, the claim is waived. *See Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) (citations omitted); *see also Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.") (citations omitted). The City's motion for summary judgment is therefore granted, and Bonner's cross-motion denied, as to the conspiracy claim.

## IV.   Conclusion

For the reasons discussed above, the parties' motions for summary judgment as to Officer O'Toole are granted in part and denied in part. Bonner's motion, [276], is granted (and O'Toole's cross-motion, [251], denied) as to O'Toole's liability for a violation of Bonner's Fourth Amendment rights, insofar as Bonner seeks compensation for damage to his door and personal effects (and any other related

injuries, such as emotional distress). Bonner's motion is denied (and O'Toole's motion granted) insofar as Bonner seeks compensation for the theft of his electronic equipment (and any related injuries). Both Bonner's and O'Toole's motions are denied as to the civil-conspiracy claim.

The City's cross-motion for summary judgment as to its liability under *Monell*, [268], is granted. Bonner's cross-motion on *Monell* liability, [276], is denied.

The "unknown officer" defendants are dismissed from the case.

ENTER:

Manish S. Shah
United States District Judge

Date: 4/3/15